# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 6, 2022

Lyle W. Cayce
Clerk

No. 22-60209

UNITED STATES OF AMERICA, EX REL, CAMERON JEHL

*Plaintiff—Appellant*,

*versus*

GGNSC SOUTHAVEN, L.L.C., DOING BUSINESS AS GOLDEN
LIVING CENTER-SOUTHAVEN; GGNSC ADMINISTRATIVE
SERVICES, L.L.C., DOING BUSINESS AS GOLDEN VENTURES;
GGNSC CLINICAL SERVICES, L.L.C., DOING BUSINESS AS
GOLDEN CLINICAL SERVICES,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 3:19-CV-91

Before RICHMAN, *Chief Judge*, and STEWART and HAYNES, *Circuit
Judges*.

PER CURIAM:*

---

* Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this
opinion should not be published and is not precedent except under the limited
circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

No. 22-60209

Relator Cameron Jehl ("the relator") brought this qui tam action against GGNSC Southaven, LLC, GGNSC Administrative Services, LLC, and GGNSC Clinical Services (collectively, "GGNSC") seeking to recover damages, penalties, fees, and costs under the False Claim Act ("FCA"). *See* 31 U.S.C. § 3729, et seq. After determining that a "complete failure of proof" existed with respect to each of the essential elements of the relator's claims, the district court granted summary judgment in favor of GGNSC. For the following reasons, we AFFIRM.

## I. FACTUAL & PROCEDURAL BACKGROUND

In 2005, Lionelle Trofort was working as a licensed registered nurse in the state of Virginia which she considered her permanent state of residence ("PSOR"). According to Trofort, she considered Virginia to be her PSOR because she lived there, her family lived there, she had been stationed there when she served in the military, and she planned to return there after she completed her work as a travelling nurse. That year, she obtained her Virginia multistate license which allowed her to work as a travelling nurse in states outside of Virginia. In 2010, she began working as a travelling nurse in medical facilities in Arizona, Arkansas, and Mississippi. While working in these out-of-state locations, Trofort would live in different hotels on the weekdays and weekends. On February 28, 2013, Trofort's multistate license was revoked by the state of Virginia. Her license was reinstated, however, after she submitted a declaration on March 20, 2013, indicating that Virginia was her PSOR.

GGNSC operates the Golden Living Center ("Golden Living") which is a 140-bed nursing home in Southaven, Mississippi. Trofort applied to work at Golden Living's Mississippi location on March 22, 2013. She was hired and began her employment as nursing director of Golden Living's Southaven facility on April 23, 2013. The following day, Golden Living

No. 22-60209

confirmed with the Virginia nursing board that Trofort held a valid active Virginia nursing license with multistate privileges.

During the period that Trofort's multistate license was revoked (February 28, 2013 through March 20, 2013), she worked at an Arkansas facility. GGNSC reported the revocation of Trofort's license to the Arkansas nursing board as it was required to do as a compact nursing board with an affirmative duty to report and disclose. The Arkansas nursing board assigned investigator Dan West to the matter. West learned that Trofort had a Tennessee driver's license and considered that fact as potential evidence that her PSOR was in Tennessee, rather than Virginia. Although the Arkansas nursing board issued a subpoena related to Trofort's work in Arkansas the previous year, it ultimately declined to take any action against her based on her possession of a Tennessee driver's license.

On February 28, 2014, less than a year after Trofort was hired as Golden Living's nursing director, she was suspended. She was then terminated on March 4, 2014. Over a year later, on May 31, 2015, the Virginia nursing board issued a final adverse action in a public ruling against Trofort, revoking her multistate credential.[1]

In the instant appeal, the relator is a licensed attorney and resident of Shelby County, Tennessee. He is not affiliated with GGNSC or Golden Living. In January 2017, he deposed Trofort in an unrelated wrongful death case. While working on that deposition, he discovered publicly available administrative depositions that had been posted on the state of Virginia's nursing board website. The post stated that between February 27th and

---

[1] The May 31, 2015 revocation of Trofort's Virginia multistate credential was based on an administrative settlement between Trofort and the state of Arizona in proceedings that are unrelated to the facts of this case.

No. 22-60209

March 19th of 2013, Trofort had "practiced professional nursing without a valid license or multistate compact license" and that she had applied to work at Golden Living in Southaven on March 22, 2013. Relying on this publicly available information, the relator filed this qui tam action in April 2019[2] on behalf of himself and the United States seeking to recover damages and fees under the FCA. *See* 31 U.S.C. § 3729, et seq. According to the amended complaint, by employing Torfort as Golden Living's Director of Nursing Services between April 23, 2013 and March 4, 2014, while she purportedly did not possess a valid Mississippi nursing license, GGNSC submitted Medicare and Medicaid claims to both the state of Mississippi and the federal government. As a result, the relator alleged, GGNSC's certifications of compliance with applicable licensure laws in their Medicare and Medicaid reimbursement requests were false within the meaning of the FCA. Consequently, the relator claimed, GGNSC received millions of dollars in Medicare and Medicaid reimbursement payments to which it was not entitled.

The relator estimated that GGNSC submitted approximately 1,393 claims during the period that Trofort allegedly lacked proper licensing and sought damages for each alleged violation. The FCA provides "for a civil penalty of not less than $5,000 and not more than $10,000" for each act in violation of the statute. *See* 31 U.S.C. § 3729(a)(1). Thus, the relator sought a base of $13,930,000 for the alleged violations, plus approximately $7 million in damages for the Government's wrongful payments to GGNSC during the applicable period, in addition to treble damages. In total, the relator sought over $30 million in his suit against GGNSC.

---

[2] The relator amended his qui tam complaint twice, in March and July of 2020.

No. 22-60209

In May 2021, GGNSC moved for summary judgment. In July 2021, the district court issued an order to show cause as to why the relator's suit against GGNSC should not be dismissed. The district judge that issued the show cause order subsequently recused himself and the case was reassigned. The newly assigned district judge reviewed the parties' briefing that had been submitted in response to the earlier show cause order and on March 30, 2022, rendered summary judgment in favor of GGNSC.

In its memorandum opinion, the district court observed that the relator alleged that Virginia could not be Trofort's true PSOR as she claimed because she listed a Tennessee address where she had been staying, had obtained a Tennessee driver's license, paid taxes in Tennessee, and registered to vote there. The district court disagreed with the relator's allegation, however, noting that "[t]here is no statute or regulation that invalidates a multistate license merely because a nurse lists an address outside her PSOR, pays taxes outside her PSOR, or obtains a driver's license outside her PSOR." The court went on to discuss the extensive guidance published by the Center for Medicare and Medicaid Services ("CMS") and the applicable Supreme Court and Fifth Circuit jurisprudence and determined that "[t]he undisputed facts [did] not establish material evidence from which a reasonable jury [could] find a violation of the FCA's falsity, knowledge, or materiality elements." On this basis, the district court concluded that there was a "complete failure of proof on each of the essential elements of the relator's claims" and thus summary judgment in GGNSC's favor was warranted.

The district court went on to opine that the relator's action would also likely fail under the FCA's public disclosure bar prohibiting "qui tam actions that are 'substantially the same' as allegations previously publicly disclosed in federal reports or from the news media unless the qui tam relator is the 'original source of the information' on which the allegations are based."

No. 22-60209

Because its summary judgment ruling was already adequately supported by alternative grounds, however, the court declined to rule on the public disclosure bar issue. This appeal ensued.

## II. STANDARD OF REVIEW

We conduct a de novo review of a district court's grant of summary judgment. *Sanders v. Christwood*, 970 F.3d 558, 561 (5th Cir. 2020). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (citing FED. R. CIV. P. 56(a)). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[C]onclusional allegations and unsubstantiated assertions may not be relied on as evidence by the nonmoving party." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "A panel may affirm summary judgment on any ground supported by the record, even if it is different from that relied on by the district court." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 438 (5th Cir. 2012) (internal quotation marks and citation omitted).

## III. DISCUSSION

On appeal, the relator asks this court to reverse the district court's summary judgment and direct entry of judgment in its favor "because there is conclusive proof establishing each element of FCA liability—falsity, knowledge, and materiality." We are unpersuaded. As the district court noted in the proceedings below, "the relator's entire FCA claim is based upon an allegation that the defendants employed a Virginia licensed nurse who lacked a valid multistate credential." But the relator's position here, as

the district court concluded, is unsupported by both CMS guidance and applicable Supreme Court and Fifth Circuit jurisprudence.

To guide the operations of long term care facilities such as Golden Living, CMS provides extensive guidance in its State Operations Manual.[3] CMS's manual states that a facility is not in breach of the governing regulation, and thus a nursing license is still considered valid, until (1) the authority having jurisdiction regarding noncompliance with its applicable laws issues a final adverse action and (2) that action is not under appeal or litigation by the facility or the professional providing services. In this context, "final adverse action" means "an adverse action imposed by the authority having jurisdiction that is more than a corrective action plan or the imposition of a civil money penalty, such as a ban on admissions, suspension or loss of a facility or professional license, etc." In other words, as the district court explained, CMS "take[s] the position that the license is invalid only after a state governing board determines it is invalid in a final adverse action from which there is no appeal."

The FCA "imposes significant penalties on those who defraud the Government." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 180 (2016). The Act "imposes liability on anyone who

---

[3] State Operations Manual, Appendix PP, Guidance to Surveyors for Long Term Care Facilities. *See* Centers for Medicare & Medicaid Services, Pub. 100-07, State Operations Provider Certification, Transmittal 70 (Jan. 7, 2011) *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R70SOMA.pdf; *see also* Centers for Medicare & Medicaid Services Memorandum from Director, Survey and Certification Group to State Survey Agency Directors regarding Clarification and revisions to Interpretive Guidance at F Tag 492, as Part of Appendix PP, State Operations Manual for Long Term Care Facilities (June 1, 2012) *available at* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/Downloads/Survey-and-Cert-Letter-12-34.pdf

knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 159 (5th Cir. 2019) (quoting 31 U.S.C. § 3729(a)(1)(A), (B)). A "claim" is considered a "direct request[] for government payment as well as reimbursement requests made to the recipients of federal funds under a federal benefits program." *Id.* (citation omitted). To determine whether liability attaches under the FCA, we ask "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *Id.* (citation omitted). "What matters is not the label that the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Escobar*, 579 U.S. at 181.

As a preliminary matter, it is undisputed that the Medicare and Medicaid reimbursement requests that GGNSC submitted when Trofort worked for Golden Living are considered "claims" for purposes of the FCA. The three remaining elements regarding FCA liability are addressed below.

*A. Falsity*

The relator first alleges that GGNSC submitted "false" claims in violation of the FCA because Trofort allegedly lacked a multistate nursing license when GGNSC submitted certain Medicare and Medicaid requests for reimbursement while representing that they were in compliance with the nurse licensure requirements that are mandated by state and federal law. We disagree. "[W]hether a claim is valid depends on the contract, regulation, or statute that supposedly warrants it. It is only those claims for money or

property to which a defendant is not entitled that are 'false' for purposes of the False Claims Act." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 674–75 (5th Cir. 2003).

GGNSC's actions while Trofort worked at Golden Living fully comported with CMS guidance that a license is invalid only after a state governing board determines it is invalid in a final adverse action from which there is no appeal. As stated supra, although Trofort's license was temporarily revoked, it was reinstated prior to the date she began her employment with Golden Living. Moreover, the day after Trofort began her employment with Golden Living, the facility confirmed with the Virginia nursing board that she held a valid active Virginia nursing license with multistate privileges. At that point, no "final adverse action" had been taken to invalidate Trofort's license. Because Trofort's license was still valid, the certifications that GGNSC submitted between April 23, 2013 and March 4, 2014 were accurate and comported with the applicable CMS guidance. GGNSC was entitled to rely on this guidance as this court affords deference to CMS's manual provisions interpreting its own regulations. *See Baylor Cnty. Hosp. Dist. v. Price*, 850 F.3d 257, 261 (5th Cir. 2017) (observing with respect to the CMS manual that "this court accords *Skidmore* deference to 'agency interpretations of statutes they administer that do not carry the force of law[.]'" (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). The relator has thus failed to show that GGNSC submitted false Medicare and Medicaid claims for reimbursement to which it was not entitled. *See Southland*, 326 F.3d at 674–75.

### B. Scienter

The relator next claims that GGNSC knew that Trofort's Virginia privileges had been invalidated by her residency in Tennessee because it had received a copy of her Tennessee driver's license and her tax forms showing

a Tennessee address. Again, we disagree. "To prove scienter, the government must show the [d]efendants had (1) actual knowledge of falsity, (2) acted with deliberate ignorance of the truth or falsity of the information provided, or (3) acted with reckless disregard of the truth or falsity of the information provided." *United States v. Hodge*, 933 F.3d 468, 473 (5th Cir. 2019) (internal quotation marks and citation omitted).

Although Trofort's multistate credential had been temporarily revoked, she did not begin her employment with GGNSC until it was reinstated. GGNSC was aware that Trofort's license was reinstated because she had submitted a declaration to the Virginia nursing board that Virginia, not Tennessee, was her PSOR. Given these circumstances, GGNSC had no reason to believe that Trofort's multistate license was invalid based on her connections to Tennessee. Indeed, GGNSC confirmed the day after Trofort began working at the Golden Living facility that she held a valid active Virginia nursing license with multistate privileges. The relator's allegations that GGNSC "knew" that Trofort's license had been invalidated are therefore meritless because Trofort's license was valid when she worked for Golden Living. Consequently, the relator cannot show that GGNSC knowingly submitted false Medicare and Medicaid claims for reimbursement. *See Hodge*, 933 F.3d at 473.

### C. Materiality

Finally, the relator contends that "this [c]ourt's test for materiality has been satisfied by overwhelming proof demonstrating that [GGNSC's] false certifications affected the Governments' payment decisions." The relator has once again missed the mark. Under the FCA, "[t]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property, which requires us to evaluate the effect on the likely or actual behavior of the recipient of the

alleged misrepresentation." *Hodge*, 933 F.3d at 473–74 (citing *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 661 (5th Cir. 2017) (quoting *Escobar*, 579 U.S. at 192–93)).

We have already determined that GGNSC did not breach the governing regulation because Trofort's multistate nursing credential was valid when she was working at Golden Living. Because there was no breach, we need not address materiality. Additionally, as the district court reasoned, "[t]he summary judgment evidence shows no linkage between nurse licensure and the amount the government pays to the defendants in satisfaction of their submitted claims." Thus, even if there was a breach, the relator could not establish that it was material in these circumstances. *See Hodge*, 933 F.3d at 473–74.

In sum, we agree with the district court that GGNSC has "demonstrated a complete failure of proof on each of the essential elements of the relator's claims" and hold that its summary judgment in favor of GGNSC was proper. *Sanders*, 970 F.3d at 561 (citing Fed. R. Civ. P. 56(a)).[4]

## IV. Conclusion

For the foregoing reasons, the district court's summary judgment in favor of GGNSC is AFFIRMED.

---

[4] We likewise agree with the district court that GGNSC makes a good public disclosure bar argument but that it is unnecessary to rule on this issue since its summary judgment in favor of GGNSC is adequately supported by other grounds in the record. *See Reed*, 701 F.3d at 438 (noting that a panel may affirm summary judgment on any ground supported by the record).