# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
May 7, 2019

Lyle W. Cayce
Clerk

No. 18-20326

United States of America, ex rel, DEBORAH LEMON, relator; SARAH DIAZ, relator; ERIC CASTILLO, relator; LAVERNE FOWLER, relator,

> Plaintiffs–Appellants

v.

NURSES TO GO, INCORPORATED; WALTER F. CROWDER; A*MED HEALTH, INCORPORATED; TEJAS QUALITY HOME HEALTH CARE, INCORPORATED; A*MED COMMUNITY HOSPICE AUSTIN, INCORPORATED; A*MED COMMUNITY HOSPICE SAN ANTONIO, INCORPORATED; DPM ALLIANCE HOSPICE AGENCY, L.L.C.; AMOR HOME HEALTH, INCORPORATED,

> Defendants–Appellees.

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, JONES, and DENNIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

*Qui tam* relators Deborah Lemon, Sarah Diaz, Eric Castillo, and Laverne Fowler appeal the district court's dismissal of their False Claims Act (FCA) suit on a Rule 12(b)(6) motion against several hospice organizations owned and operated by Walter Crowder.  The district court found the fraudulent claims, as alleged, immaterial.  We disagree and therefore reverse and remand for further proceedings.

No. 18-20326

## I.

### A.    FACTUAL BACKGROUND[1]

Relators are former employees at Nurses To Go, a hospice care provider in Austin, Texas. Relator Deborah Lemon served as an administrator and supervising nurse; Relator Laverne Fowler served as a nurse and alternate administrator; Relator Sarah Diaz was an administrative assistant; and Relator Eric Castillo was a human resources and payroll representative. Each worked at Nurses To Go at various times between November 2013 and November 2015.

Defendants in this action are Walter Crowder, who is the president and director of Nurses To Go as well as the other named corporate defendants.[2] Defendants provide hospice services throughout Texas with operations in Austin, Cypress, Houston, Pasadena, San Antonio, and Texas City. The headquarters and center of Defendants' operations are in Texas City, where executives maintain control, establish policies, manage and direct personnel in all Defendants' offices, and where billing policies are made and managed. All Defendants submit claims for payment to Medicare for hospice services through the Texas City headquarters.

During their employment, Relators allegedly discovered irregularities in Defendants' billing practices to Medicare for hospice services. These discoveries were based in part on an audit of patient charts from Defendants' Austin office in 2015 by Relators Lemon and Diaz. Relators learned that

---

[1] The facts in this section were recited in the complaint, which we must take as true at the pleading stage. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] Named as defendants in this action are Nurses To Go, Inc. and Walter Crowder, as well as A*Med Health, Inc.; Tejas Quality Home Health Care, Inc.; A*Med Community Hospice Austin, Inc; A*Med Community Hospice San Antonio, Inc.; DPM Alliance Hospice Agency, L.L.C.; and Amor Home Health, Inc.

Defendants failed to complete and maintain certifications and recertifications for hospice patients; failed to complete and maintain physician narratives in support of certifications for hospice patients; allowed non-medical personnel to complete certifications for hospice patients; allowed non-medical personnel to complete physician narratives for hospice patients; failed to have required face-to-face encounters between physicians and patients; permitted nurses to conduct required face-to-face encounters with hospice patients instead of a physician or nurse practitioner; completed certifications after the time period required for completion; failed to write individualized plans of care; and billed for and provided services to deceased patients.  Despite these alleged violations of the relevant Medicare statute, 42 U.S.C. § 1395f, and its implementing regulations, Defendants submitted claims to Medicare affirming that they satisfied these statutory and regulatory requirements.

In their complaint, to highlight these deficient certifications, Relators specifically pointed to seven hospice patients' records (JS, CB, DW, TO, NS, LS, and TS), with allegations similar to those this paragraph:

> Hospice patient CB was admitted by Defendants' Austin office in January of 2013.  Though CB had received hospice services since 2009, Defendants failed to perform a face-to-face encounter with her upon admittance.  Between this time and June of 2015, Defendants routinely failed to provide a physician narrative in support of certifications.  Likewise, during this period, Defendants failed to conduct at least three required face-to-face encounters.  Defendants sought payment for their services to CB from Medicare despite failing to comply with Medicare hospice certification requirements.  Defendants were improperly paid by Medicare for their services to CB.

Additionally, Relators described a scheme in which Defendants reaped a premium payment from the Government by automatically enrolling patients in "continuous home care," when the patients did not qualify for this type of

hospice service.[3]     According to Relator Lemon, during her employment training, an administrator of Defendants "told [her] that [they] utilized continuous care as a marketing tool," providing 72 hours of continuous care for new patients at the beginning of hospice treatment, regardless of whether a "period of crisis" existed.  Continuous care is the costliest hospice service; Medicare regulations reserve this round-the-clock care only for patients experiencing a crisis.[4]

When Lemon began her role as an administrator in June 2015, she discovered that Defendants' Austin office was in fact improperly billing for continuous care.  She described: "[O]ne hospice patient was on the second week of continuous care treatment," even though such care is only allowed for brief periods of time when the patient is experiencing a crisis.  Lemon later told Defendant Crowder that they must report these violations and overpayments to Medicare, but Crowder refused.

After Lemon re-trained staff on the limited availability of continuous care service, the billable hours for such care in the Austin office were reduced from an average of 323 hours per month (from October 2014 to June 2015) to less than ten hours per month (5 hours in July 2015, 8 hours in August 2015, no hours in September 2015, and 10.75 hours in October 2015).  In October 2015, the Texas City headquarters sent an administrator from its Houston office to meet with Austin personnel to push for more continuous care hours. The Houston administrator instructed that "each new hospice admission required continuous care."

---

[3] Continuous home care with round-the-clock service should only be furnished during a brief period, "a period in which the individual requires continuous care to achieve palliation and management of acute medical symptoms."  42 C.F.R. §§ 418.302(b)(2) & 418.204(a).

[4] *See id.*

4

No. 18-20326

Finally, Relators claimed that "on approximately four occasions in 2013–2014, patients were admitted by the Defendants' Austin office to hospice care despite already being deceased."

## B.   PROCEDURAL HISTORY

Relators filed the instant action under seal in June 2016. In June 2017, the Government declined to intervene. Relators thus elected to bring this case on the Government's behalf. In October 2017, Relators filed the operative first amended complaint. In November 2017, Defendants filed a Rule 12(b)(6) motion to dismiss on grounds that Defendants' alleged violations, if true, were immaterial under the FCA and that Relators failed to plead with the requisite particularity under Rule 9(b). Following a hearing, the district court dismissed this case, holding that Defendants' underlying acts, as alleged, were immaterial under the FCA and that Relators supposedly lacked bases to bring this action against their non-employer organizations.[5] This appeal timely followed.

## II.

We review de novo the district court's dismissal of Plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6).[6] We accept as true all well-pleaded allegations of fact in the complaint and construe them in the light most favorable to Plaintiffs.[7] We evaluate whether the factual allegations, together with all reasonable inferences, state a plausible claim to relief.[8]

---

[5] As mentioned below, *infra* III.B, we make no determination of whether Relators made a sufficient pleading under Rule 9(b).

[6] *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 379 (5th Cir. 2003).

[7] *Id.*

[8] *United States ex rel. Marcy v. Rowan Cos.*, 520 F.3d 384, 388 (5th Cir. 2008).

No. 18-20326

## III.

### A.   FALSE CLAIMS ACT

We resolve this appeal on the sole ground relied on by the district court in dismissing the complaint: whether the Medicare fraud, as alleged, is material under the False Claims Act.

The FCA imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."[9]  A "claim" includes direct requests for government payment as well as reimbursement requests made to the recipients of federal funds under a federal benefits program.[10]   "In determining whether liability attaches under the FCA, this court asks (1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)."[11]   The only issue on appeal is whether Relators' alleged violations are material.[12]

### 1.   Materiality

Under the FCA, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."[13]

---

[9] 31 U.S.C. § 3729(a)(1)(A), (B); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

[10] 31 U.S.C. § 3729(b)(2)(A).

[11] *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 654 (5th Cir. 2017) (citations omitted).

[12] The district court did not address, nor did the parties brief on appeal, other FCA elements.

[13] 31 U.S.C. § 3729(b)(4); *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 468 (5th Cir. 2009) (citing *Neder v. United States*, 527 U.S. 1, 16 (1999)).

6

No. 18-20326

The Supreme Court recently elaborated on the factors that lower courts should consider in determining materiality under the FCA. In *Universal Health Services, Inc. v. United States ex rel. Escobar*, the Court considered whether the so-called "implied false certification" theory can be a basis for FCA liability.[14] The Court held in the affirmative, and stated that "liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory or contractual requirement. In these circumstances, liability may attach if the omission renders those representations misleading."[15] In other words, the Supreme Court made clear that defendants could be liable under the FCA for violating statutory or regulatory requirements, whether or not those requirements were designated in the statute or regulation as conditions of payment.

After their daughter's death, the relators in *Escobar* filed a *qui tam* suit against the defendant health provider for submitting reimbursement claims for medical services but failing to disclaim serious violations of regulations pertaining to qualifications and licensing requirements for staff performing these services.[16] The petition alleged that the medical provider flouted regulations requiring that mental health services be performed by properly licensed clinicians (*i.e.*, psychiatrists, social workers, or nurses). The plaintiffs' claim was based on the fact that medical benefits were paid based on requests for reimbursement for services performed by unlicensed, unqualified, and unsupervised staff—in violation of regulations that did not expressly provide

---

[14] 136 S. Ct. 1989, 1999 (2016).

[15] *Id.* at 1995.

[16] *Id.* at 1997.

that compliance was a condition of payment for these services.[17]   The defendant, Universal Health Services, however, argued that because the regulations did not make compliance with licensing and other provider qualifications conditions of payment, the violations could not be material.[18]

The Supreme Court rejected Universal Health's argument, holding that "when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive."[19]   In explaining its refusal to adopt a flat rule that billing for services without complying with a requirement expressly made a condition of payment is material, the Court stated: "Under Universal Health's view, misrepresenting compliance with a requirement that the Government expressly identified as a condition of payment [without regard to its importance] could expose a defendant to liability.  Yet, under this theory, misrepresenting compliance with a condition of eligibility to even participate in a federal program when submitting a claim would not."[20]

*Escobar* explained some of the evidence relevant to the materiality issue: (1) "the Government's decision to expressly identify a provision as a condition of payment" and (2) "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual

---

[17] *Id.* at 1998.

[18] *Id.* at 2001.

[19] *Id.* at 2003.

[20] *Id.* at 2002.  We read this quoted passage as a strong signal that "misrepresenting compliance with a condition of eligibility to even participate in a federal program when submitting a claim" can be particularly important in a materiality analysis under the FCA. For example, if a physician or hospice director does not have a face-to-face meeting with the patient and certify that the patient has terminal illness with a life expectancy of less than six months, the patient's eligibility to participate at all in the hospice program is not triggered.  It is hard to see how a violation such as this would not be material.

requirement."[21]     Moreover, (3) materiality "cannot be found where noncompliance is minor or insubstantial."[22]   The Supreme Court remanded *Escobar* to the First Circuit to reconsider materiality in light of these factors.[23]

**2.     Analysis**

We now address each *Escobar* factor in turn.  The materiality test under the FCA is demanding.[24]   No one factor is dispositive, and our inquiry is holistic.[25]

a.     *Conditions of Payment*

We first decide whether the alleged violations are conditions of payment. Though we recognize from *Escobar* that if a requirement is labelled a condition of payment and it is violated, that alone does not conclusively establish materiality.[26]    But "it is certainly probative evidence of materiality."[27] Section 1395f(a)(7) of the Medicare statute lists a number of certifications that are "conditions of . . . payment for" hospice services relevant to this case.[28] Specifically, § 1395f(a)(7) provides that "payment for services furnished" may be made "only if" the certification,[29] face-to-face encounter,[30] and plan-of-care[31] requirements are made.  Moreover, Medicare regulations for hospice services state that "to be covered," certifications regarding terminal illness must be

---

[21] *Id.* at 2003.

[22] *Id.*

[23] *Id.* at 2004.

[24] *Id.* at 2003 ("The False Claims Act is not 'an all-purpose antifraud statute' or a vehicle for punishing garden-variety breaches of contract or regulatory violations.") (citations omitted); *see Harman*, 872 F.3d at 663 (recognizing *Escobar* heightened the standard for finding materiality under the FCA).

[25] *Escobar*, 136 S. Ct. at 2003.

[26] *See id.*

[27] *United States ex rel. Rose v. Stephens Institute*, 909 F.3d 1012, 1020 (9th Cir. 2018).

[28] 42 U.S.C. § 1395f(a)(7).

[29] *Id.* § 1395f(a)(7)(A); *see also* 42 C.F.R. §§ 418.20 & 418.22.

[30] *Id.* § 1395f(a)(7)(D)(i).

[31] *Id.* § 1395f(a)(7)(B) & (C).

completed.[32] Relators' claims in this case are based on Defendants' fraudulent certifications of compliance with the above listed requirements, which Congress and Medicare have expressly identified as "conditions of payment." These regulations also condition coverage (or eligibility) of a patient to receive any Medicare hospice service on certification by the provider of a terminal illness. Accordingly, we find that Defendants' alleged fraudulent certifications of compliance with statutory and regulatory requirements violate conditions of payment under § 1395f(a)(7).[33]

### b.    *Government Enforcement*

We next consider whether the Government would deny Defendants reimbursement payments if it had known of these alleged violations.[34] As the *Escobar* Court explained, "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material."[35] Conversely, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled

---

[32] 42 C.F.R. § 418.22(b) (stating certifications "must conform" or the hospice care provider cannot be paid).

[33] Several district courts have also found that hospice certification provisions of the Medicare statute and regulations are conditions of payment. *See, e.g.*, *Druding v. Care Alternatives, Inc.*, 164 F. Supp. 3d 621, 629 (D.N.J. 2016); *United States ex rel. Fowler v. Evercare Hospice, Inc.*, No. 11-CV-00642-PAB-NYW, 2015 WL 5568614, at *7 (D. Colo. Sept. 21, 2015) ("the requirement that physicians' certifications are accompanied by clinical information and other documentation that support a patient's prognosis is a condition of payment under applicable Medicare statutes and regulations."); *see also, e.g.*, *United States ex rel. Hinkle v. Caris Healthcare, L.P.*, No. 3:14-CV-212-TAV-HBG, 2017 WL 3670652, at *9 (E.D. Tenn. May 30, 2017) ("the government's complaint alleges that defendants' written certifications were false, in that the documentation for certain patients did not support a prognosis of terminal illness.").

[34] *Harman*, 872 F.3d at 663 ("though not dispositive, continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality.").

[35] *Escobar*, 136 S. Ct. at 2003.

no change in position, that is strong evidence that the requirements are not material."[36]

In their complaint, Relators alleged that the U.S. Department of Health and Human Service's Office of Inspector General has taken criminal and civil enforcement actions against other hospice providers that submitted bills for ineligible services or patients, including situations where the provider failed to conduct appropriate certifications.

We are satisfied that Relators raised a reasonable inference that the Government would deny payment if it knew about Defendants' alleged violations. The Sixth Circuit's recent opinion in *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, weighing *Escobar* factors at the motion to dismiss stage, is persuasive.[37] In *Prather*, the relator asserted that the defendants fraudulently sought reimbursements from Medicare for home health services without first obtaining a certification of need from a physician as required by federal regulations.[38] The Sixth Circuit held that *Escobar* does not require the relator to allege in the complaint specific prior government actions prosecuting similar claims.[39] The Sixth Circuit reasoned: "The Supreme Court was explicit that none of the factors it enumerated were dispositive. Thus, it would be illogical to require a relator (or the United States) to plead allegations about past government action in order to survive a motion to dismiss when such allegations are relevant, but not dispositive."[40] Indeed, the Government's legal investigations are often conducted in secrecy;

---

[36] *Id.* at 2003–04.
[37] 892 F.3d 822 (6th Cir. 2018).
[38] *Id.* at 828–29.
[39] *Id.* at 833.
[40] *Id.* at 834 (citations omitted).

we do not expect Relators to know precisely the Government's prosecutorial practices without the benefit of discovery.[41]

Defendants' reliance on the Centers for Medicare & Medicaid Services' *Program Integrity Manual* is unavailing. Defendants highlight a snippet from this manual that states: "[A contractor] shall not expend Medicare Integrity Program (MIP)/MR resources analyzing provider compliance with Medicare rules that do not affect Medicare payment." This isolated passage is no help to Defendants because the violations alleged *do* affect payment—§ 1395f(a)(7), listing certifications as conditions of payment for hospice services, says so.[42] Furthermore, Defendants' patient enrollment scheme—automatically providing 72 hours of continuous care for new patients without regards to medical diagnosis—overbills the Government for unnecessary hospice services.

We are satisfied that Relators' allegations are sufficient to state a claim that the Government would deny payment if it knew of Defendants' false certifications.

### c.    *Substantial or Minor*

Our final inquiry goes to whether "noncompliance is minor or insubstantial."[43] A violation is material if a reasonable person "would attach importance to [it] in determining his choice of action in the transaction" or "if the defendant knew or had reason to know that the recipient of the

---

[41] *Cf. United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 906 (9th Cir. 2017) (noting that although discovery may reveal "that the government regularly pays this particular type of claim in full despite actual knowledge that certain requirements were violated, such evidence is not before us" and the relator had sufficiently alleged facts supporting that the requirement at issue was material).

[42] 42 U.S.C. § 1395f(a) ("Requirements of requests and certifications").

[43] *Escobar*, 136 S. Ct. at 2003.

representation attaches importance to the specific matter 'in determining his choice of action,' even though a reasonable person would not."[44]

Since we determine that the allegations are sufficient to establish that the Government would deny payment here, we also conclude that the Government would "attach importance" to the underlying violations. The reason is apparent: "Because a patient must be certified as terminally ill to be eligible for Medicare, false terminally-ill certifications may lead the government to make a payment which it would not otherwise have made."[45] Moreover, continuous home care—the costliest care among the four hospice services—is reserved for patients experiencing a crisis and such care is intended to be brief. We have no reason to believe that Medicare would reimburse Defendants for unnecessary hospice services.

Though Defendants argue that they billed for what they did—*i.e.*, providing continuous care—and therefore did not commit fraud, their assertion misses the point. Defendants cannot provide and charge for services without certifying that the patients are first eligible for those services under the terms of eligibility established by Congress and Medicare, which limit hospice services to a distinct class of patients. The violations, as alleged, are therefore not minor.

Accordingly, in light of *Escobar*, we find that Relators have alleged material violations.

## B.   RULE 9(B): PLEADING WITH PARTICULARITY

In the alternative, Defendants argue that the district court dismissed the complaint for failure to satisfy Rule 9(b)'s requirement to allege fraud with particularity. They assert that the district court ruled on this issue when it

---

[44] *Id.* at 2002–03 (alteration in original) (quoting RESTATEMENT (SECOND) OF TORTS § 538 (1976)).

[45] *Hinkle*, 2017 WL 3670652, at *9.

stated that "relators' claims do not rise to the level of alleging fraud" and that "[Relators] might have heard rumors [about their non-employer hospice defendants] but that is the extent of their knowledge."

We decline to accept such general language as an analysis of the pleading-with-particularity requirement under Federal Rule of Civil Procedure 9(b).[46]  We therefore vacate the district court's dismissal of all defendants and claims to the extent it was premised on Rule 9(b).  On remand, the district court should apply the familiar Rule 9(b) rubric and adhere to our precedent in *United States ex rel. Grubbs v. Kanneganti*.[47]

\*     \*     \*

For these reasons, we REVERSE and REMAND this case for further proceedings to allow the district court to conduct a Rule 9(b) particularity analysis consistent with our decision in *Grubbs*.

**REVERSED AND REMANDED.**

---

[46] *See United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 381 (5th Cir. 2009) (declining to perform Rule 9(b) analysis in the first instance); *Riley*, 355 F.3d at 380 (same).

[47] 565 F.3d 180, 185 (5th Cir. 2009).